The **PORT OF PORTLAND**, an Oregon municipal corporation, Plaintiff,

v.

The **M/V PARALLA**, now known as the **M/V CAPE EDMONT**, and all her appurtenances, Defendant.

Nos. 86–1375–MA, 86–1360–MA, 86–1389–MA, 86–1432–MA and 86–1433–MA.

United States District Court, D. Oregon.

June 30, 1988.

Gordon T. Carey, Jr., Portland, Or., for Port of Portland.

Clifford B. Alterman, Wayne D. Palmer, Kell, Alterman & Runstein, Portland, Or., John J. Reilly, Tracy L. Klestadt, Haight, Gardner, Poor & Havens, New York City, for Connecticut Nat. Bank.

Joseph M. VanLeuven, Ragen, Tremaine, Krieger, Schmeer & Neill, Portland, Or., for Automar IV Corp. and M/V Paralla.

## OPINION

MARSH, District Judge.

The Port of Portland filed this action in admiralty to foreclose its claim of maritime lien on the vessel M/V Paralla, now known as the M/V Cape Edmont, pursuant to 46 U.S.C.App. § 971, et seq. (Supp. III 1985). The Connecticut National Bank, as intervenor and cross-claimant, seeks enforcement of its claim of a first preferred ship's mortgage pursuant to the Ship Mortgage Act under 46 U.S.C.App. § 921, *et seq.* (Supp. III 1985). Jurisdiction is exercised pursuant to 28 U.S.C. § 1333 (1987). A court trial was held and this opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## BACKGROUND

In June of 1985, Automar IV Corporation (hereinafter "Automar IV" or "the own-

er"), a wholly owned subsidiary of American Automar, Inc. purchased the M/V Paralla (hereinafter "the Paralla" or "the vessel") from Redrisktiebolaget Transatlantic (hereinafter "Transatlantic"), a Swedish corporation. The agreement was conditioned upon the United States Department of Transportation, Maritime Administration (hereinafter "Marad"), awarding a contract to purchase the vessel from Automar IV upon the performance of conversion work to the vessel for entrance into the Ready Reserve Fleet of the United States Navy.

American Automar had been involved in previous agreements to supply ships to Marad and had reconditioned other vessels under similar awards. Automar IV was specifically organized to engage in the project concerning the Paralla.

Financing arrangements were made through the English Bank, Samuel Montagu & Co., Limited (hereinafter "Montagu"). In order to fulfill the requirements for a first preferred ship mortgage, the financing had to be arranged through a trustee approved by Marad. Connecticut National Bank (hereinafter "CNB") qualified as such a trustee and in that capacity handled the bonds issued by Automar IV and purchased by Montagu. CNB held the stock of Automar IV as security and was designated as mortgagee on the first ship mortgage issued by Automar IV on the Paralla.

The transactions necessary to complete this arrangement extended from June, 1985, to July, 1986. In addition to the preparation of documentation, Transatlantic and Automar IV cooperated, as seller and buyer, in partially refurbishing the Paralla in order to satisfy the condition in their sale agreement to bring the vessel up to class for acceptance and purchase award by Marad.

At the same time the purchase from Transatlantic and the award by Marad were being consummated, Automar IV was exploring facilities that might be available for the final reconditioning of the vessel, taking bids, and formulating a contract with Northwest Marine Iron Works, an Oregon corporation, (hereinafter "NW" or

"the contractor"), which was awarded the project. The activity culminated between June 30, 1986, when the vessel arrived in Portland, Oregon, and July 7, 1986, when the first ship mortgage in favor of CNB was recorded with the U.S. Coast Guard in Philadelphia, Pennsylvania.

The Port of Portland (hereinafter "the Port") is a municipal corporation which operates the Portland Ship Repair Yard on Swan Island, Portland, Oregon. Several businesses related to ship repair are also located on Swan Island and the major contractors utilize the Port's facilities in performing their work. NW is one such local contractor.

The Port contends that beginning on June 30th, it supplied significant and necessary services to the Paralla as the basis for a valid ship's lien predating the mortgage of CNB. The Port also makes three contentions that the mortgage of CNB is invalid. First, the Port contends that arrangements between Automar IV and Montagu, on the one hand, and between Automar IV and Transatlantic on the other prevented the vessel from being a vessel of the United States ownership. Second, that the affidavit of good faith required by the Ship Mortgage Act was invalid. Third, the Port contends that CNB waived its mortgage by electing to have a private sale of the vessel.

CNB counters all the Port's contentions and argues that the Port's claim of a lien fails for several reasons. First, CNB contends that any services supplied by the Port prior to the inception of the mortgage were neither necessary nor significant enough to support a claim of lien. Second, CNB claims that the necessary agency relationship did not exist between the owner and NW to form the basis of authorization necessary to charge the vessel for services rendered by the Port. Finally, CNB contends that, even if the Port did perform services prior in time to CNB's mortgage, the Port waived enforcement of the lien by dealing with NW in such a manner as to indicate the Port relied upon the credit of NW and not upon the vessel for payment of the Port's invoices.

The contentions of the Paralla are more concise. If neither the Port nor CNB have valid claims then the vessel wins. The vessel also supports CNB's position in relation to the Port's claims. That is that the Port did not supply services on a basis necessary to support a lien, or the lien was waived by the Port, or if the Port has a lien, the lien is inferior to CNB's mortgage.

## FACTUAL DISCUSSION

### I. Port's Claim of Lien

■ Entitlement to a maritime lien is controlled by 46 U.S.C.App. §§ 971, *et seq.* To prevail in establishing a maritime lien, a lien claimant must have (1) furnished repairs, supplies or other necessaries, (2) to any vessel, (3) "upon the order of the owner of such vessel, or of a person authorized by the owner." *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A.*, 808 F.2d 697, 699 (9th Cir.1987), *cert. denied sub nom, Itel Containers Intern, Corp. v. M/V C.C. San Francisco,* — U.S. —, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987). Once established, a lien may nevertheless be waived if the lien claimant solely relies upon a source of payment other than the credit of the vessel. The applicability of waiver in this case is discussed under Section II.

A "person authorized by the owner" includes any person to whom management of a vessel at port is entrusted. 46 U.S.C. App. § 972. The Ninth Circuit has held that authority to make repairs is not a delegation of authority to manage a ship and a provision in the contract which provides that supplies obtained by a subcontractor become supplies of the vessel is also not an adequate delegation of authority. *Farwest Steel Corporation v. Barge Sea–Span,* 828 F.2d 522, 525–526 (9th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1594, 99 L.Ed.2d 909 (1988). Further, the Ninth Circuit has held that for purposes of this statute, a general repair contractor or independent contractor is not a general manager of the ship. *Id.* at 526. However, a general contractor that is the agent for the vessel and acts at the direction of the owner to engage a specific subcontrac-tor for repairs is a "person authorized by the owner." *Id.*

■ Agency is the fiduciary relationship which results from the joint manifestation of consent by one person that another shall act on his behalf and subject to his control, and of consent by that other to so act. *Grace Line, Inc. v. Todd Shipyards Corp.,* 500 F.2d 361, 373 (9th Cir.1974); *Restatement (Second) of Agency* § 1(1) (1958). The agent's consent must be manifest and is evidenced by, *inter alia,* the actual dealings between the parties. *Whisper Soft Mills, Inc. v. N.L.R.B.,* 754 F.2d 1381, 1386 (9th Cir.1984).

■ The evidence offered by the Port established that preliminary work commenced almost immediately upon the vessel's arrival at the Port facilities on June 30, 1986. Personnel of NW boarded the vessel and measured out the work to be performed, cleaned ballast tanks, onloaded machinery and generally prepared for the reconstruction work. In order to perform this preliminary work, NW called upon the cranes of the Port to load equipment, set the gangway, and install utilities to the vessel.

I am satisfied from the testimony of workers, foremen, supervisors and engineers that the efforts of the Port between June 30, 1986 and July 7, 1986 were necessary, reasonable and significant to the performance of the contract. Indeed, the vessel's project superintendent, William Burns, supported the Port's position on this issue. CNB contends these efforts cannot support a lien as the work by NW and the services of the Port were supplied before the actual signing of the conversion contract by NW on July 8, 1986. However, the parties had agreed in principle with only some financial assurances left for settlement. Once the contract was signed, no one contended that the services were not included within its terms. While the final financial assurances are relevant to issues discussed later herein, I find that the Port did perform services which could form the basis of a lien prior to the filing of CNB's mortgage. I find the value of those servic-

es and use fee to be $570,270.25 as set forth in Exhibit 1025.

I further find that Automar IV made four payments to NW under the conversion contract as follows:

| | | |
|---|---|---|
| | September 18, 1986 | $4,000,000 |
| | September 30, 1986 | $1,000,000 |
| | October 24, 1986 | $1,000,000 |
| | October 28, 1986 | $ 800,000 |

The payments were made in response to NW's invoices by funds being sent to NW's account at First Interstate Bank. None of the funds were applied to invoices due from NW to the Port in respect to the Paralla.

The more difficult issue in determining the validity of a lien relates to the issue of agency and authority. The Port claims that the owner, Automar IV, helped arrange the association between the Port and NW so as to constitute express authority or special selection in NW to act as the vessel's agent and to bind the vessel for the Port's services.

A large segment of the testimony related to a meeting of June 4, 1986 when representatives of the vessel, the Port and NW met to discuss the possible contract with NW to perform the conversion work. The owner's search for a contractor had progressed to the point where ship repair yards in Portland and San Diego were competing for the job. San Diego had a lower bid, but Portland had been recommended to Automar IV by Mr. Burns. While there is great dispute over who led the discussion, it is agreed that the Port considered an adjustment in its use fee in order to make the bid of NW more competitive. Following the meeting, the use fee was reduced in response to an application filed with the Port by NW. Once NW received this reduction, it adjusted its bid. Automar IV then accepted the bid and the contract was signed as of July 3, 1986.

Plaintiff repeatedly points to this meeting, contending that it not only establishes that Automar IV was aware of the use of the Port as a particular required subcontractor, but also supports its claim that NW was thereupon designated as Automar IV's agent with authority to bind the vessel. I find the evidence lacking to support this latter contention.

The evidence elicited from David Neset and David Cheramy, both representatives of the Port, clearly established that other meetings of this type occurred and that the discounts, like those allowed here, were regularly granted for the purpose of assisting local repair yards to obtain business where competition was strong. In fact, the reduction here was also offered to Dillingham Shipyard, another contractor located at the Port's facility and the other company bidding for the Paralla contract. No one contended that Automar IV was working through Dillingham to obtain a discount or pre-approve the Port as a subcontractor. Thus, while a discount was not extended in every case, the fact that it was extended here does not indicate some special effort or intent on the part of Automar IV to have a direct or indirect relationship with the Port. In fact, witnesses for the Port agree that the topic of agency or authority was never discussed at the meeting or at any other time. Thus, I find that the events surrounding the June 4, 1986 meeting do not support the contentions of the Port other than that Automar IV knew the Port would be involved as a subcontractor as it was the only facility available.

I further find that the Port totally failed to support its contention of agency authority so as to bind the vessel for the Port's invoices. In making this finding I also rely upon the fact that the conversion contract between NW and Automar IV clearly created an owner-independent contractor relationship between the parties. In addition, both the contractor, through Mr. Zavin, its president and C.E.O., and Automar IV, through its officers, declared that no agency relationship existed. Invoices of the Port were sent only to NW. No contact was made between the Port and the vessel or its owner relative to invoices, payment, application or non-payment until after the bankruptcy of NW. Other than the meeting of June 4, 1986, little occurred to indicate that the Port and the Automar IV had any significant contact with one another.

All efforts of the Port were ordered directly by NW.

The claim of lien which NW asserted in this case was rejected by the opinion of Judge Leavy dated February 11, 1987. *Port of Portland v. M/V Paralla,* Civ. No. 86–1375, (D.Or. February 11, 1987). It is interesting that Judge Leavy's opinion was based in part upon the provisions of Article 23(a) of the conversion contract between Automar IV and NW, which protected Automar IV against any liens by NW and Article 23(b) which required NW to remove any liens that may be filed by others. It is inconsistent with these provisions to contend that NW had any authority to allow liens.

In addition, Automar IV did not relinquish management or control of the vessel to NW. While NW may have scheduled drydock facilities and requested movement of the vessel from wharf to drydock and back, it did not manage the vessel to constitute a person presumed to have authority from the owner under 46 U.S.C.App. § 972 (Supp. III 1985). The management was always retained by Automar IV through its own officers and through its inspectors, representatives, engineers, and architects.

Pacific Gulf and Marine, Inc. (hereinafter "Pacific Gulf") is a marine management company which managed the vessel for Automar IV. When the Paralla purchase was made, Pacific Gulf was hired as the vessel's manager. William Burns, a retired vice president and consultant for Pacific Gulf, was hired through Pacific Gulf by Automar IV to oversee the reflagging and conversion of the Paralla and was paid directly by Automar IV. Burns used Pacific Gulf as a support service and reported through it to Robert Carlton, vice president of Automar IV. John West, a Pacific Gulf engineer, assisted William Burns.

C.R. Cushing & Co. is a marine architect firm and was technical consultant to Automar IV to make sure that the reconditioning was done in a manner in compliance with Coast Guard standards. C.R. Cushing & Co. was represented on the Paralla project by Ronald Williamson and Robert Stanley. In addition, Montagu had Mr. Howell as its representative on the project. Mr. Howell reported directly to Montagu.

I find all of these consultants, engineers and inspectors other than Mr. Howell to be owner's representatives who maintained management of the vessel, to insure the performance of the contract and to monitor its progress. Thus, I find these individuals on behalf of Automar IV were the persons to whom management of the vessel was entrusted, not NW.

My conclusion is not altered by the fact that the Port's use agreement with NW designates NW as the ship's agent;[1] nor the owner's knowledge that NW could only use the Port's facilities for its type of services. I therefore conclude that the Port did not perfect a valid lien against the vessel.

II. Waiver of Lien

As noted above, 46 U.S.C.App. § 971 removes from a lien claimant's prima facie case the necessity of proving reliance on the credit of the vessel. If, however, it is affirmatively shown that a lien claimant exclusively relied upon a source of payment other than the credit of the vessel, the claimant may be deemed to have waived the lien. *Farwest Steel Corp. v. Barge Sea–Span 241,* 828 F.2d at 525. *See Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 606 (5th Cir.1986) (en banc), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed. 2d 575 (1986). Laches may also constitute a waiver under 46 U.S.C.App. § 974. *See Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 521 (2d Cir.1979).

In *Equilease Corp.,* the Fifth Circuit discussed this shifting of burdens as a "presumption." The court noted that despite the clear language of the statute, the idea of credit to the vessel as a prerequisite to a lien is still recognized. Accordingly, the court noted that § 971 acts as a presump-

---

1. The use agreement was executed by the Port and NW. Automar IV was not a party to the agreement and did not take part in its drafting. Automar IV did not assent to the agency designation nor was that term's existence or meaning discussed between the parties.

tion "that one furnishing supplies to a vessel acquires a maritime lien."

██ Whether the language of § 971 is discussed as a shifting of the burdens or a presumption, I conclude that, assuming the Port established all elements of a maritime lien, it waived its lien by relying exclusively upon the credit of NW. I find the evidence of waiver to be conclusive for a number of reasons.

In order for the Port to generate income and assist in the economic growth of the ship repair industry, it encouraged companies such as NW by advising them of available opportunities and cooperating with them in obtaining contracts. The fee discount situation discussed above is one such form of cooperation.

The Port facilities on Swan Island constitute the only facilities available to the contractors. Thus, both the Port and the contractors complement one another for the attraction and performance of ship repair contracts. This association is often referred to as a "partnership" between the Port and contractors. While it is not a partnership in the legal sense, the description is appropriate to describe the sense of cooperation and mutual benefit found in the relationship.

NW was often described by Port personnel as having a long, close and successful relationship with the Port. However, by the early part of 1986, NW had fallen behind in its account with the Port. By May and June, 1986, NW owed the Port approximately $2 million of which $800,000 was over 90 days delinquent. (Exhibit 1076) The Port instituted regular checks upon this account and insisted that all amounts over 90 days be cleared by the end of August, 1986. To accomplish this task, NW was required to pay $100,000 per week.

By the end of July, 1986, it was clear that the plan was not working. The debt level was even worse. A new plan was structured with a target date of December 31, 1986. Still the debt increased and on about October 1, 1986, NW was put on a vague pay-as-you-go plan to assure the debt did not get larger. By November, the debt had grown in excess of $2 million and $800,000 was delinquent over 120 days. NW then went into bankruptcy.

In addition to the various attempts to work out its debt with the Port, NW was also trying to maintain its line of credit with First Interstate Bank. As part of its arrangement with the bank, NW obtained a letter of undertaking covering the work on the Paralla to assure payment would be made through the bank as the work progressed.[2] When Automar IV initially discussed the contract with NW, it required a performance bond. NW was not able to obtain a bond and, therefore, payments on the contract were to be postponed for 70 days, the initial estimate to complete the work. This arrangement brought about the need for the letter of undertaking. Automar IV was financed by Montagu through the CNB as trustee. It was therefore up to Montagu to supply the letter of undertaking which it agreed to do. Thus, as the parties entered into performance of the contract, NW was in the midst of a work out with the Port and was subject to the restrictions of First Interstate on its line of credit.

I find that while Automar IV was aware that NW had an account with the Port and a line of credit with First Interstate, it was not aware of the gravity of NW's financial situation nor its deteriorating condition. Plaintiff repeatedly attempted to elicit testimony demonstrating that Automar IV was aware of NW's condition. The issue was covered over and over without success. Automar IV acknowledged disputes over extra items and invoices in the latter stages of the contract and the necessity to increase the letter of undertaking. However, I conclude that it did not become a party to nor have any understanding of NW's financial troubles or its involvement

---

**2.** It is the requirement of this letter of undertaking which held up the signing of the conversion contract between NW and Automar IV until June 8, 1986. This letter of understanding also supported Judge Leavy's holding that NW had waived a lien by relying upon payment assured by the financing arrangement with Montagu.

with the Port or First Interstate Bank. I was also not convinced that the location of Mr. Burns' office in the NW facility infers special knowledge to Mr. Burns.

In the meantime, the Port, fully aware of NW's financial situation, continued its work out programs without any attempt to have payments applied to the invoices issued for the services supplied to the Paralla. All of the $100,000 per week payments required in June, July and August were applied to 90 day accounts. No attention was given to current accounts. While the Port may not have been aware of the payments made to NW through First Interstate on the Paralla contract, it didn't inquire about payment nor pay any attention to those invoices. Instead, the Port held weekly meetings with NW to analyze the old accounts and apply the payments made by NW to 90 day or older invoices irrespective of the source of the funds.

The Port's attempts to establish that the application of payments was made at the direction of NW utterly fails. The Port color-coded summaries of the old invoices to be paid each week with interest being paid first on old invoices. I find the invoice summaries marked for payment were selected by the Port and delivered to NW for payment. Mr. Alvis, Business Manager in charge of finances for the Port, testified in plaintiff's case in chief that the procedure described was usually followed by both the Port and NW unless there was a mistaken credit. Again, in plaintiff's rebuttal case, Mr. Alvis acknowledged that the color-coded invoice summaries were used for the preparation of payments by NW and then often returned to the Port with the payment.

I find that the Port controlled the application of payments to old accounts without regard to the source of payment or the status of current invoices. By this practice, the Port relied exclusively on NW and relinquished any reliance upon the credit of the vessel.

There are other factors which support my conclusion that the Port waived a lien. The Port charged 18% interest on the old accounts, thus necessarily utilizing current sources of NW income to pay interest on old unrelated invoices. There were no invoices or copies issued to the Paralla or its owner. No credit check was requested of the vessel or its owner. The Port had the authority under tariff agreement to refuse service to NW if an account was over 30 days. No threat of termination was made to NW. The Port just decided to wait and see, giving NW the opportunity to work things out. In addition, the Port looked upon its several arrangements with NW as new extensions of credit. Although the Port issued invoices to NW on other ships within the facility in October of 1986, no liens were claimed nor effort made by the Port to collect from the owners. The Port filed a claim in bankruptcy for its entire account from NW including services rendered to the Paralla and accepted a plan of payment for the discharge of that account. While I do not determine whether this arrangement amounted to a discharge of the debt, I do find it consistent with the overall intention of the Port to deal with NW exclusively.

### III. CNB's Claim of Mortgage

Even though I have concluded that the Port does not have a valid lien, or alternatively, that it waived a lien, it is still necessary to consider the right of CNB against the vessel. Here, the issue is not one of authority, reliance or priority but rather of validity. The mortgage in favor of CNB is valid against the vessel only if it complies with the Ship Mortgage Act. The crucial requirements of the Act, insofar as the issues of this case are concerned, relate to the ownership of the vessel and the execution of the Good Faith Affidavit.

The Ship Mortgage Act (hereinafter "Act") grants preferred status to a mortgage lien on American-flag vessels owned by United States citizens. 46 U.S.C.App. §§ 911 *et seq.* (Supp. III 1985); *Seattle-First National Bank v. Bluewater Partnership*, 772 F.2d 565, 569 (9th Cir.1985). The Act permits foreign investment in U.S. vessels provided the financing technique involves a United States citizen as a trustee. *Id* (citations omitted).

To be a trustee for purposes of the Act, an entity must comply with the requirements of 46 U.S.C.App. § 961(e) (Supp. III 1985). This requires that an entity (1) be organized as a corporation, doing business under the laws of the United States or any state of the United States, (2) be authorized by federal or state law to exercise corporate trust powers, (3) be a United States citizen, (4) be subject to supervision or examination by federal or state authority, and (5) have a combined capital surplus of at least $3 million. *Id.* at 571. CNB is an approved trustee as established by the last section of Exhibit A4 of Trial Exhibit 1201.

■ The evidence established that Automar IV was wholly owned by American Automar, 56.2 percent of which was owned by United States citizens. J. William Charrier and Andrew Gibson are both citizens of the United States and constitute a majority of the directors of Automar IV. The only party with influence such that it might have tried to exercise control of the vessel was Montagu. I find in fact Montagu could not have controlled it and Montagu did not exercise any such control in any manner. The stock pledges and tendered resignations to be used in the event of default held no greater significance than ordinary security.

The Port attempted to establish that a form of partnership or joint venture existed between Automar IV and Montagu as an outgrowth of the financing arrangements. The attempt fails. Even though CNB and Montagu had previous dealings and Montagu's finance fee was in part based upon the success of Automar IV's venture, there was no interest, liability, nor share in the profits in Montagu other than through Montagu's 4.99 percent interest in American Automar which in turn owned Automar IV. Automar IV had offered a participating interest to Montagu and was turned down. Extensive questioning of Montagu officer Henny O'Brien failed to establish anything other than a legitimate financing arrangement. Finally, Montagu was not a party to the purchase of the vessel from Transatlantic, nor the contracts with Marad or NW. Montagu also retained its own project representative who oversaw the job and reported directly to Montagu instead of relying upon Automar IV's representative for status reports.

The deposition testimony of Ms. O'Brien also repeatedly addressed the issue of Montagu's knowledge of the financial condition of NW and its involvement in the letter of undertaking when the performance bond was unavailable. All of these attempts to prove lack of care in dealing with NW were not persuasive. I find that the involvement of Montagu was above board and reasonable. I find no business interest or joint venture between Montagu and Automar IV, nor any control in Montagu that would constitute a form of ownership under the Ship Mortgage Act.

■ Finally, the Port attempted to show a continuing ownership interest of the vessel by Transatlantic. The fact that Transatlantic arranged for preliminary repairs in Korea only supports Automar IV's contention that a condition of the purchase contract required Transatlantic to bring the vessel up to class for Marad to make its award prior to conversion work. Transatlantic also had a chance to gain if Automar's venture was successful through an adjustment in the purchase price. That opportunity did not make Transatlantic a party in interest or establish ownership. Transatlantic was not a signator with Marad, NW, CNB or Montagu. It had no liability, only a chance of increased purchase price. The arrangement was negotiated at arms length and did not create a partnership or joint venture.

■ Another requirement of the Act is that the mortgage must be accompanied by an affidavit of good faith. 46 U.S.C.App. § 922(a)(3). Specifically, the Act requires that an affidavit be filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel. *Id.*

The Ninth Circuit has held that substantial compliance with the Act's requirements is sufficient. *Seattle First National*

*Bank,* 772 F.2d at 570. *But see The Nan B,* 78 F.Supp. 748, 749 (D.Alas.1948) (Act should be strictly construed so far as protection of creditors and lienors from fraud and similar acts); *The Schooner Adeline and Cargo,* 13 U.S. (9 Cranch) 244, 3 L.Ed. 719 (1815) (use of affidavits of agents "who may swear truly, and yet, from want of knowledge, be the dupe of cunning and fraud" was condemned by the Supreme Court).

The Port also attacked the affidavit of good faith in an attempt to avoid the mortgage. The Port contends that Benjamin Flow, an attorney for American Automar and Automar IV, did not have authority nor personal knowledge and understanding necessary to sign the affidavit. I disagree. This matter was first addressed in my opinion of June 11, 1987, denying the Port's motion for partial summary judgment. *Port of Portland v. M/V Paralla,* Civ. 86–1375 (D.Or. June 11, 1987). I held at that time that an attorney properly authorized and vested with a power of attorney could execute the good faith affidavit. I did, however, allow the Port to take further discovery to test the sufficiency of the corporate action leading up to the power of attorney and the knowledge of Mr. Flow prior to the execution of the affidavit.

Considerable testimony, both live and by deposition, addressed this problem. I am impressed by Mr. Flow's understanding of the entire transaction and his familiarity with the documentation and the ultimate adoption of the corporate resolutions and issuance of the power of attorney which authorized his action. Further, the testimony of Mr. Gibson, Mr. Charrier, Mr. Hopkins and others convinces me that there was the necessary authority, personal knowledge of the transaction and intention of the corporation as stated in the affidavit of good faith and underlying documents and understanding to satisfy this requirement of the Ship Mortgage Act. Finally, the execution and timing of the documents was proper and, thus, the affidavit of good faith valid.

The Port's final contention that CNB waived its mortgage by electing a private sale of the vessel is without merit. The substitution of funds for the vessel was made by order of the court in Judge Leavy's opinion of February 20, 1987. *Port of Portland v. M/V Paralla,* Civ. 86–1375 (D.Or. February 20, 1987). Fed.R. Civ.P. Supplemental Rule E(5)(a).

As I reach the above conclusions, further consideration of the alternative theories of the Paralla is not necessary.

## CONCLUSION

I conclude that CNB possesses a valid enforceable ship's mortgage which became effective July 7, 1986. Even though the Port had rendered services prior to that date, the Port did not prove a valid lien or in the alternative waived its lien rights. The amount due on CNB's mortgage is $6,493,537.99 including interest to January 1, 1988.

The parties are to petition for costs, attorneys fees, and costs associated with the arrest of the Paralla.